IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY S. HADLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 5:14-CV-229-D |
| | ) | |
| DUKE ENERGY PROGRESS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| TIMOTHY S. HADLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 5:14-CV-387-D |
| | ) | |
| DUKE ENERGY PROGRESS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

On April 17, 2014, Timothy S. Hadley ("Hadley" or "plaintiff") filed suit in this court against Duke Energy Progress, Inc. ("DEP") and seven other corporate defendants [D.E. 1].[1] On July 9, 2014, the same eight defendants, along with four individual defendants, (collectively, "defendants") removed to federal court a second case that Hadley filed against them in North Carolina Superior Court. See 5:14-CV-387-D [D.E. 1]. On July 31, 2014, the court consolidated the two cases [D.E. 21]. See [D.E. 22]; 5:14-CV-387-D [D.E. 24]. On September 15, 2014, Hadley filed an amended consolidated complaint against all twelve defendants. See Consol. Compl. [D.E.

---

[1] Unless otherwise noted, all docket entry citations refer to the lead case in this consolidated action, 5:14-CV-229-D.

25]. On July 20, 2015, defendants moved for summary judgment and filed a supporting memorandum [D.E. 49, 50]. See Fed. R. Civ. P. 56. On September 8, 2015, Hadley responded in opposition [D.E. 65]. On October 6, 2015, defendants replied [D.E. 69]. As explained below, the court grants defendants' motion for summary judgment [D.E. 49].

I.

Hadley worked for Carolina Power and Light Company and its successor company, DEP, from August 5, 2002, until his termination on December 7, 2010. Hadley Aff. [D.E. 66] ¶¶ 2, 4; Hadley Dep. [D.E. 50-4] 28, 132, 136.[2] In May 2006, Hadley was promoted. Hadley Dep. 28; see Hardison Decl. [D.E. 51] ¶ 5. Hadley worked in DEP's Project Controls group and, from March 30, 2009, until his termination, worked as a Senior Technical Project Management Specialist. See Hadley Dep. 28; Hardison Decl. ¶ 5; Montgomery Decl. [D.E. 52] ¶ 4. During that time, Hadley reported to Richard Montgomery ("Montgomery"), who in turn reported to Glenda Hardison ("Hardison"). Hadley Aff. ¶¶ 4–5.

On January 31, 2008, Hadley had lunch with Montgomery and Hardison. Hadley Dep. 284. At the lunch, Montgomery and Hardison told Hadley that he would receive a raise in salary that year. Id.; see [D.E. 50-31]; Hardison Dep. [D.E. 50-6] 11–12; Montgomery Dep. [D.E. 50-8] 87. Hadley, however, wanted the raise to be effective retroactively to May 2006, when he was promoted. See Hadley Dep. 284; Hadley Aff. ¶ 6. According to Hadley, Montgomery and Hardison promised that he would receive four monetary Energy Advantage Awards ("EAAs") to compensate him appropriately for the time between May 2006 and when the raise would take effect. See Hadley Dep. 281, 285–86; Hadley Aff. ¶¶ 6–8.

---

[2] All citations to depositions refer to the deposition page number. The first time a deposition is cited, the court notes its docket entry location.

2

According to Hadley, he periodically asked Montgomery about the status of the EAAs from 2008 through September 2009. See Hadley Aff. ¶¶ 9–10; Hadley Dep. 286–87, 301–04. As of October 30, 2008, DEP had not paid the EAAs to Hadley. See Hadley Dep. 303–04. In November 2008, Hadley contacted DEP Human Resources ("HR") representative Sue Bathgate regarding the EAAs. Id. 304–05. In response, Montgomery called Hadley into a one-on-one meeting and told Hadley that he would be fired if he continued to pursue the EAAs with HR. Id. 305–06. Hadley alleges that he spoke with Montgomery about the EAAs again during an August 2010 meeting concerning Hadley's 2010 mid-year review, and Montgomery repeated his threat. Compare id. 144, 318–19, and Hadley Aff. ¶ 34, with Montgomery Decl. ¶ 19. On October 29, 2010, Hadley again mentioned the EAAs to HR. See Hadley Dep. 68–69; [D.E. 50-16].

In 2008 and early 2009, Hadley worked on DEP's Wayne County plant project (the "Wayne project"). In October 2009, Hadley also began to work also on DEP's Smart Grid Program ("Smart Grid"), an energy efficiency project funded in part by a matching grant awarded under the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5 § 1553, 123 Stat. 115, 297 ("ARRA"). Hadley Aff. ¶¶ 16–19; see Montgomery Decl. ¶ 7; Hardison Dep. 21–22; Hardison Decl. ¶ 10.

In December 2009, Hadley discovered that DEP had paid International Business Machines Corporation ("IBM") over $4 million for work that Hadley considered to be "not worth anywhere near the amount that IBM billed." Hadley Aff. ¶ 22. In November and December 2009, Hadley criticized the value of IBM's work to Montgomery and Hardison, telling them that he was concerned that "DEP was submitting costs to U.S. government agencies that . . . could not be substantiated." Id. ¶ 23. On December 22, 2009, Hadley received an IBM task order that would pay IBM over $3.5 million for three months work but would require "no deliverables." See Hadley Aff. ¶ 24; [D.E. 50-20, 50-21].

3

On January 5, 2010, Hadley told Montgomery that he "would not initiate the . . . order" because of IBM's poor performance, because the task order did not require deliverables from IBM, and because DEP's own schedulers could "do the same work for approximately 10% of the cost." Hadley Aff. ¶ 26. Throughout December 2009 and January 2010, Hadley complained to DEP personnel, including Rob Horton, Richard Montgomery, Sue Tucker, Bobby Simpson, Becky Harrison, and Kent Hendrick, that the "data on the Smart Grid Program was being inaccurately reported to the Federal Department of Energy" and that there were "major discrepancies with what DEP was proposing to send to the Department of Energy as basis for [an ARRA matching grant]." Id. ¶¶ 27–28; see Hadley Dep. 197–256, 348–49; [D.E. 50-23–50-26]. In October 2010, Hadley also complained about Smart Grid to HR Representative Nadine Kloecker-Dunn. Hadley Dep. 69–70. Hadley believed DEP's actions were improper, "constituted a gross mismanagement of an ARRA contract and ARRA funds," "constituted a gross waste of ARRA funds," and "constituted an abuse of authority" related to use of ARRA funds. Hadley Aff. ¶¶ 29–33; [D.E. 50-20, 50-21]. Hadley thought that the IBM work was "junk," that "the project was in complete shambles," and that there was "no rationale or basis behind any of [IBM's] numbers." Hadley Dep. 201, 213, 224, 227. In January 2009, Montgomery told Hadley that "there would be consequences" for his repeated complaints regarding Smart Grid. Hadley Aff. ¶ 34.

In early 2010, Hadley asked to be removed from Smart Grid. Hadley Dep. 151–52; Montgomery Decl. ¶ 9. Montgomery granted Hadley's request and assigned Hadley to a project in Sutton, North Carolina. Hadley Aff. ¶ 35; Montgomery Dep. 59–61. Sutton is a 2.5 hour drive from Hadley's home in Raleigh. See Hadley Aff. ¶ 35. At the time of Hadley's reassignment, Montgomery did not believe Hadley would be required to be present physically in Sutton on a daily basis. Montgomery Decl. ¶ 14. However, around May 2010, DEP enacted a policy change that

4

required Project Controls employees to be physically present at their assigned project locations on a daily basis. Id.; Hadley Dep. 154–55. Hadley was not the only employee that this change affected. Hadley Dep. 155. In mid-2010, Montgomery told Hadley that he would need to begin working full-time at Sutton beginning in the third quarter of 2011, approximately 15 months later. Montgomery Decl. ¶ 16; see Hadley Dep. 162.

Hadley refused to travel to Sutton. See Hadley Dep. 156–58, 161–62. In August 2010, Montgomery told Hadley that if he refused to travel to Sutton, he would no longer have a position in Project Controls. Moreover, Montgomery sent Hadley a memo stating that, in light of his refusal to travel to Sutton, Hadley's employment would end on October 15, 2010, if he did not find another position within DEP. Montgomery Decl. ¶ 18; Hadley Dep. 157–60; [D.E. 50-19]. Hadley did not find another position within DEP by October 15, 2010, but he remained employed with DEP until December 7, 2010. See Hadley Dep. 164, 355.

In August or early September 2010, Montgomery noticed that Hadley had a considerable balance of unused vacation time. Montgomery Decl. ¶ 20. This fact surprised Montgomery because Hadley "typically took a ski vacation each year." Id.; compare also [D.E. 50-11–50-13], with [D.E. 50-15]. On September 15, 2010, Montgomery instructed Hadley via email to change his timesheet to reflect the correct vacation time. Montgomery Decl. ¶ 21; Montgomery Dep. 68–70; Hadley Dep. 60–63; [D.E. 50-14]; see also Hardison Dep. 39–41. Hadley did not reply to Montgomery's email, but allegedly left a voicemail for Montgomery explaining that he had intentionally miscoded the vacation time to compensate himself for holiday time that had been misrecorded as vacation time in 2009. Hadley Dep. 63; see Hadley Aff. ¶¶ 41–43. Hadley did not change his timesheet as Montgomery had requested and acknowledges that miscoding time violates company policy. Nonetheless, Hadley contends that Montgomery approved Hadley's timekeeping method to

5

compensate for the alleged 2009 vacation error. See Hadley Dep. 35–39, 43–52, 63, 82–83; Hadley Aff. ¶ 43.

DEP investigated whether Hadley violated DEP's Code of Ethics by falsifying his timesheets. After interviewing Hadley and reviewing Hadley's building access and business-computer records for 2009 and 2010, investigator Eugene Simmons concluded that Hadley had falsified his timesheets. Simmons Dep. [D.E. 50-5] 17, 21–23, 35, 40; [D.E. 50-47]. Simmons summarized his findings in a memorandum reproduced at Docket Entry 50-47. The first page of the memorandum is dated December 2, 2010, but the other pages are dated December 8, 2010. See [D.E. 50-47] 1–3. The memorandum states under "Management Actions" that "the subject's employment was terminated on December 6, 2010." Id. 3.

On December 7, 2010, DEP terminated Hadley's employment. The parties dispute who made the decision to terminate Hadley, but the dispute is not material. Compare Hardison Dep. 47–48, Hardison Decl. ¶ 22 (stating that Hardison made the decision), and Montgomery Dep. 75 (claiming that Montgomery took no part in the decision), with Kloecker-Dunn Dep. [D.E. 50-7] 83–84 (testifying that Montgomery and Hardison made the decision). In any event, Hardison testified that she decided to terminate Hadley's employment based on Simmons's conclusion that Hadley had falsified his timesheets. See Hardison Dep. 47–48.

After his termination, Hadley filed multiple complaints with the North Carolina Department of Labor regarding the nonpayment of the EAAs and alleged that he was terminated because he complained about unpaid wages. The North Carolina Department of Labor rejected all of Hadley's claims. See Hadley Dep. 287–88, 329–31, 335–38; [D.E. 50-20, 50-29, 50-42–50-44]. Hadley also filed an action in North Carolina Small Claims Court, which he later voluntarily dismissed. See Hadley Dep. 288, 351, 355; [D.E. 65] 11; [D.E. 50-45]. On May 1, 2013, Hadley filed a complaint

6

with the United States Department of Energy raising an ARRA claim. See [D.E. 50-28] 3. On March 13, 2014, the Department of Energy denied Hadley's claim. Id. 13; Hadley Dep. 273–78.

II.

In his amended consolidated complaint, Hadley makes four claims: (1) retaliation in violation of the ARRA; (2) violation of North Carolina's Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. §§ 95-240–245; (3) violation of the North Carolina Wage and Hour Act ("Wage and Hour Act"), N.C. Gen. Stat. § 95-25; and, (4) wrongful discharge in violation of North Carolina public policy. See Consol. Compl. ¶¶ 90–133. Defendants seek summary judgment on each claim. See [D.E. 50].

In considering defendants' motion for summary judgment, the court views the evidence in the light most favorable to Hadley and applies well-established principles under Rule 56 of the Federal Rules of Civil Procedure. See, e.g., Fed. R. Civ. P. 56; Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325–26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–55 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson, 477 U.S. at 247–48. The party seeking summary judgment must initially demonstrate an absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 325. Once the moving party has met its burden, the nonmoving party must affirmatively demonstrate that there exists a genuine issue of material fact for trial. See Matsushita, 475 U.S. at 586–87.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Conjectural arguments will not suffice. See id. at 249–52; Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving

7

party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). It is insufficient to show a "mere . . . scintilla of evidence in support of the [nonmoving party's] position . . . ; there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

A.

First, Hadley alleges reprisal against him in violation of the American Recovery and Reinvestment Act of 2009. Consol. Compl. ¶¶ 90–99; see American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5 § 1553, 123 Stat. 115, 297. ARRA provides "whistleblower" protection to any "employee of any non-Federal employer receiving covered funds" by prohibiting any "reprisal for disclosing . . . information that the employee reasonably believes is evidence of . . . (1) gross mismanagement of an agency contract or grant relating to covered funds; (2) a gross waste of covered funds; . . . (4) an abuse of authority related to the implementation or use of covered funds; or (5) a violation of law, rule, or regulation related to an agency contract . . . or grant . . . relating to covered funds." ARRA § 1553; see Fuqua v. SVOX AG, 754 F.3d 397, 400–01 (7th Cir. 2014); Gerhard v. D. Constr., Inc., No. 11 C 0631, 2012 WL 893673, at *2 (N.D. Ill. Mar. 14, 2012) (unpublished); Hosack v. Utopian Wireless Corp., Civil Action No. DKC 11-0420, 2011 WL 1743297, at *6 (D. Md. May 6, 2011) (unpublished); see also Adams v. U.S. Dep't of Justice, No. CIV. 10-3117, 2012 WL 4468468, at *5 (W.D. Ark. Aug. 8, 2012) (unpublished), report and recommendation adopted, No. 3:10-CV-03117, 2012 WL 4472039 (W.D. Ark. Sept. 26, 2012) (unpublished); Sears v. Cty. of Monterey, No. C 11-01876 SBA, 2012 WL 368688, at *6 (N.D. Cal. Feb. 3, 2012) (unpublished); cf. [D.E. 65] 7 (asserting that Hadley seeks relief pursuant to subsections 1, 2, 4, and 5). ARRA provides an administrative scheme that a plaintiff must exhaust before asserting an ARRA claim in court. See ARRA § 1553(c)(3); Sears v. Cty. of Monterey, No.

8

5:11-CV-01876-LHK, 2013 WL 256764, at *6 (N.D. Cal. Jan. 23, 2013) (unpublished); Delmore v. McGraw-Hill Co., Inc., No. 12-CV-1306-JPS, 2013 WL 3717741, at *3 (E.D. Wisc. July 12, 2013) (unpublished); Hosack, 2011 WL 1743297, at *6. To recover under ARRA's whistleblower provision, a plaintiff must prove by a preponderance of the evidence that he (1) made a protected disclosure, (2) suffered a reprisal, and (3) the protected disclosure was a contributing factor in the reprisal. ARRA § 1553(a), (c)(1)(A). If a plaintiff proves these elements, the employer can rebut the claim with proof, by clear and convincing evidence, "that [the employer] would have taken the action constituting the reprisal in the absence of the disclosure." Id. § 1553(c)(1)(B); cf. Johnson v. Stein Mart, Inc., 440 F. App'x 795, 801–04 (11th Cir. 2011) (per curiam) (unpublished) (discussing an analogous provision under the Sarbanes-Oxley Act of 2002 ("SOX")); Hemphill v. Celanese Corp., 430 F. App'x 341, 345 (5th Cir. 2011) (per curiam) (unpublished) (same).

To meet the first element, a plaintiff must show that he made a protected disclosure. A protected disclosure requires two things. First, a plaintiff must have made a protected disclosure "to the Board, an inspector general, the Comptroller General, a member of Congress, a State or Federal regulatory or law enforcement agency, a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct), a court or grand jury, the head of a Federal agency, or their representatives." Id. § 1553(a). Second, when the protected disclosure concerns mismanagement, waste, or an abuse of ARRA funds, the misconduct must be so severe that the employee "reasonably believes" it to be "gross." Id.

No federal court of appeals has addressed what constitutes "reasonable belief" of "gross" misconduct concerning ARRA funds. However, several district courts have dismissed claims that do not suffice. See, e.g., Gerhard, 2012 WL 893673, at *2 (dismissing claimed ARRA violations

9

because "neither incident could reasonably be considered to be . . . a 'gross mismanagement' or 'gross waste' of covered funds"). To be actionable, ARRA requires the misuse of funds be severe enough that the employee subjectively believes that it is "gross" and severe enough that a "reasonabl[e]" employee in plaintiff's position would consider it "gross." ARRA § 1553(a); Gerhard, 2012 WL 893673, at *2–3; cf. Livingston v. Wyeth, Inc., 520 F.3d 344, 352 (4th Cir. 2008) (interpreting an analogous whistleblower provision under SOX); White v. Dep't of the Air Force, 391 F.3d 1377, 1381–82 (Fed. Cir. 2005).

ARRA does not define "gross mismanagement," but several courts have interpreted substantially identical language in the Whistleblower Protection Act ("WPA"), 5 U.S.C. § 2302(b)(8). Gross mismanagement under the WPA occurs when the "conclusion that [the employer] erred is not debatable among reasonable people." White, 391 F.3d at 1382. However, whistleblower protection does not provide a forum to litigate "policy disputes between the employee and [employer]." Id. at 1381. Even when an employee identifies a "debatable expenditure that is significantly out of proportion to the benefit reasonably expected to accrue [to the employer]," "debatable" policies do not reach the threshold of "gross mismanagement." Chambers v. Dep't of the Interior, 515 F.3d 1362, 1366, 1368 (Fed. Cir. 2008) (quotation omitted); Yeh v. Merit Sys. Protection Bd., 527 F. App'x 896, 900–01 (Fed. Cir. 2013) (unpublished) (per curiam).

Second, a plaintiff must prove that he was "discharged, demoted, or otherwise discriminated against." ARRA § 1553(a).

Third, a plaintiff must prove that the protected disclosure was a "contributing factor" in the alleged reprisal. Id. § 1553(c)(1)(A)(I). A plaintiff "need not show that the activities were a primary or even a significant cause of his termination." Feldman v. Law Enf't Assocs. Corp., 752 F.3d 339, 348 (4th Cir. 2014) (interpreting identical language in the SOX whistleblower protection scheme);

10

Ameristar Airways, Inc. v. Admin. Rev. Bd., 650 F.3d 562, 567–68 (5th Cir. 2011) (interpreting analogous language in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century). Moreover, a plaintiff may use direct or circumstantial evidence to demonstrate that the protected disclosure "contribut[ed]" to the employer's decision to inflict reprisal. ARRA § 1553(c)(1)(A)(ii). Circumstantial evidence may include temporal proximity between the protected disclosure and the reprisal and proof that the decisionmaker who undertook the reprisal knew of the protected disclosure. Id.; Gerhard, 2012 WL 893673, at *3. However, merely identifying a "slight temporal connection," or isolated "suspicious facts" does not suffice. See Gerhard, 2012 WL 893673, at *4. Interpreting the "contributing factor" language of SOX, the Fourth Circuit has held that a "legitimate intervening event" or passage of time can "sever[] the causal connection." Feldman, 752 F.3d at 348–49; see id. (citing, with approval, a case that held a ten-month gap severed the causal connection between protected activity and alleged reprisal).

Hadley's ARRA claim fails. First, Hadley's opinion of IBM's work on the Smart Grid project as "a joke," "junk," and "garbage" does not constitute "gross mismanagement" under ARRA. Cf. Hadley Dep. 197–256. Even viewing the evidence in the light most favorable to Hadley, Hadley has failed to show that he made any disclosure that he reasonably believed was protected under ARRA. See, e.g., [D.E. 69] 2–4. Although Hadley subjectively believed that IBM's work on Smart Grid constituted a "mismanagement" or "waste" of resources, Hadley's opinion does not create a genuine issue of material fact. See, e.g., id.; Yeh, 527 F. App'x at 900–01; Chambers, 515 F.3d at 1366, 1368; Livingston, 520 F.3d at 352; White, 391 F.3d at 1381–82; Gerhard, 2012 WL 893673, at *2–3. ARRA's whistleblower provision does not convert federal courts into a forum for employees to engage in spending-policy debates with their employer. See, e.g., Chambers, 515 F.3d at 1366, 1368.

11

Alternatively, no reasonable jury could find that Hadley's alleged protected disclosure concerning Smart Grid was a "contributing factor" in the alleged reprisal. In his administrative ARRA claim, Hadley raised three possible reprisals: denial of the EAA bonuses that he claims DEP promised in 2008, the demand that he work in Sutton, and termination of his employment. Hadley Dep. 174–76; see [D.E. 50-28] 10–12.

First, Hadley's dispute regarding the alleged unpaid EAA bonuses began years before he worked on Smart Grid. Thus, no rational jury could find that his complaints about Smart Grid contributed to Hadley's failure to receive EAA bonuses. See Hadley Dep. 152, 286–87-301–02; accord [D.E. 50-28] 10 n.7.

Second, no reasonable jury could find that any alleged protected statements about Smart Grid contributed to Hadley's reassignment to the Sutton project. Hadley asked to be removed from Smart Grid. See Hadley Dep. 152–167. Moreover, when Montgomery removed Hadley from Smart Grid and transferred Hadley to the Sutton project, Montgomery had no idea that the Sutton Project would require that Hadley be physically on site in Sutton. See Montgomery Decl. ¶ 14. Thus, no rational jury could find that defendants transferred Hadley to the Sutton project as reprisal for Hadley's alleged protected statements. See, e.g., Otero v. City of Chi., No. 10 CV 2284, 2013 WL 530977, at *3, *6 (N.D. Ill. Feb. 6, 2013) (unpublished) (holding that plaintiff provided "no evidence" that her transfer to a different shift was retaliatory under Title VII of the Civil Rights Act of 1964 when she had requested the reassignment); Sturdivant v. Geren, Civil Action No. 1:09-CV-586, 2009 WL 4030738, at *7 (E.D. Va. Nov. 19, 2009) (unpublished), aff'd sub nom., Sturdivant v. McHugh, 450 F. App'x 235 (4th Cir. 2010) (per curiam) (unpublished) (holding that a voluntary transfer without reduction in pay cannot qualify as an adverse employment action).

Finally, no rational jury could find that Hadley's alleged protected statements concerning

12

Smart Grid contributed to his termination. Hadley's protected statements concerning Smart Grid primarily occurred between December 2009 and January 2010, but his termination was on December 7, 2010. The ten-month time period between the bulk of his alleged protected statements about Smart Grid and his termination does not support a causal inference. See Gerhard, 2012 WL 893673, at *3; see also Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (per curiam) (suggesting that three-to-four-month gap between protected activity and adverse employment action is insufficient evidence of causation under Title VII).

Furthermore, even though Hadley made one alleged protected statement in October 2010, that statement also is not sufficient in this case. See Gerhard, 2012 WL 893673, at *3 (noting that a five-week gap amounted to only "slight temporal proximity," and "a temporal connection, standing alone, rarely suffices to show a causal connection, even for summary judgment purposes"); see also Feldman, 752 F.3d at 348–49. Notably, during 2010, Hadley miscoded his vacation time and refused to correct it. Moreover, Hadley acknowledges that DEP could terminate his employment based on his miscoded hours. See Hadley Dep. 31–33, 82–83. Hadley also admits that his supervisors asked him to correct his timesheets, but he did not do so. Id. 60–63; cf. Kuduk v. BNSF Ry. Co., 768 F.3d 786, 792 (8th Cir. 2014) (holding that "an intervening event that independently justified adverse disciplinary action" negated any causal inference drawn from temporal proximity under the Federal Rail Safety Act); Feldman, 752 F.3d at 348–49. That Montgomery could have corrected Hadley's timesheets himself does not negate Hadley's misconduct or his insubordination. Likewise, the conflicting dates on the internal memorandum summarizing the investigation into Hadley's timesheets do not undermine Hardison's good-faith belief that Hadley violated company policy by falsifying his timesheets and therefore could be terminated. Cf. Hardison Dep. 47–48 (stating that Hardison made the decision on the basis of the investigation, not the memorandum summarizing it);

See [D.E. 65] 10. The intervening events in 2010 concerning Hardison's good-faith belief that Hadley falsified timesheets independently justified DEP's adverse employment action against Hadley and negate any causal inference. See, e.g., Kuduk, 768 F.3d at 792; Feldman, 752 F.3d at 348–49. Even viewing the evidence in the light most favorable to Hadley, no rational jury could find that his alleged protected statements concerning Smart Grid contributed to his termination. Thus, the court grants summary judgment to defendants on Hadley's ARRA claim.

B.

Hadley seeks relief under North Carolina's Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. §§ 95-240–245. See Consol. Compl. ¶¶ 116–23. Hadley claims that defendants retaliated against him for inquiring about his wages with HR and complaining to HR about Smart Grid. See id.

North Carolina state law governs this claim; therefore, the court must determine how the Supreme Court of North Carolina would rule on Hadley's claim. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co., 433 F.3d 365, 369 (4th Cir. 2005). If the state supreme court "has spoken neither directly nor indirectly on the particular issue before [the federal court, that court must] . . . predict how [the state supreme] court would rule if presented with the issue." Id. (quotations omitted). In making that prediction, the court "may consider lower court opinions[,] . . . treatises, and the practices of other states." Id. (quotation omitted). When predicting an outcome under state law, a federal court "should not create or expand [a] [s]tate's public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (first alteration in original) (quotation omitted); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999) (quotation omitted).

REDA prohibits retaliation against any employee who "in good faith does or threatens to .

14

. . [f]ile a claim or complaint, initiate any inquiry, investigation, inspection, proceeding, or other action, or testify or provide information to any person with respect to . . . [the North Carolina Wage and Hour Act]." N.C. Gen. Stat. § 95-241(a). To prove retaliation under REDA Hadley must show that (1) he exercised rights protected under REDA, (2) he suffered an adverse employment action, and (3) his exercise of protected rights caused the retaliatory action. Wiley v. United Parcel Serv., Inc., 164 N.C. App. 183, 186–87, 594 S.E.2d 809, 811 (2004); see Salter v. E & J Healthcare, Inc., 155 N.C. App. 685, 690–92, 575 S.E.2d 46, 49–51 (2003).

As for whether an employee has exercised rights protected under REDA, REDA requires that employees pursue or threaten to pursue a "claim or complaint, [or] initiate[] . . . [an] action" outside any internal grievance systems that their employer has developed. Complaining internally, such as an employee complaining to his supervisor or to human resources, does not suffice. See Pierce v. Atl. Grp., Inc., 219 N.C. App. 19, 26–28, 724 S.E.2d 568, 574–75 (2012). In Pierce, the North Carolina Court of Appeals affirmed a dismissal for failure to state a claim under REDA when the employee merely raised his concerns to his supervisors. Id. at 26, 724 S.E.2d at 574. In support of this conclusion, the Pierce court adopted the reasoning and conclusion of the United States District Court for the Middle District of North Carolina in Delon v. McLaurin Parking Co., 367 F. Supp. 2d 893, 902 (M.D.N.C. 2005), aff'd, 146 F. App'x 655 (4th Cir. 2005) (per curiam) (unpublished), and Cromer v. Perdue Farms, Inc., 900 F. Supp. 795, 801 n.6 (M.D.N.C. 1994), aff'd, 65 F.3d 166 (4th Cir. 1995) (per curiam) (unpublished table decision). See Pierce, 219 N.C. App. at 27, 724 S.E.2d at 574–75. In Delon and Cromer, the Middle District of North Carolina held that internal complaints did not constitute protected activity under REDA. Pierce, 219 N.C. App. at 26–28, 724 S.E.2d at 574–75; see also Bell v. Branch Banking & Tr. Co., No. 1:06CV649, 2007 WL 4233165, at *12 (M.D.N.C. Nov. 28, 2007) (unpublished) (holding that REDA does not cover internal complaints).

15

Hadley claims that defendants retaliated against him for inquiring with DEP's human resources department about his wages. See Hadley Aff. ¶ 12. The record demonstrates, however, that Hadley never initiated any inquiry outside DEP until after his termination. In light of Pierce, Delon, and Cromer, the court predicts that the Supreme Court of North Carolina would hold that internal complaints do not constitute protected activity under REDA. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013). Accordingly, the court grants summary judgment to defendants on Hadley's REDA claim.

C.

Hadley seeks relief under the Wage and Hour Act, N.C. Gen. Stat. § 95-25. Specifically, Hadley alleges that he was promised EAA bonuses in January 2008, but that defendants never paid him. See Consol. Compl. ¶¶ 100–15; Hadley Dep. 281, 285–86. According to Hadley, by November 2008, he believed that the bonuses were overdue and repeatedly complained about their nonpayment, yet never received them. See Hadley Dep. 286–87, 303–04.

Construing the evidence in the light most favorable to Hadley, Hadley's bonuses became due, at the latest, on January 31, 2009. The Wage and Hour Act requires that bonuses (if due and payable) should be paid at least annually. See N.C. Gen. Stat. § 95-25.6. The Wage and Hour Act includes a two-year statute of limitations. See id. § 95-25.22(f). The limitations period begins to run when wages allegedly become due and the employer fails to pay. Kornegay v. Aspen Asset Grp., LLC, 204 N.C. App. 213, 233–34, 693 S.E.2d 723, 738 (2010); Hamilton v. Memorex Telex Corp., 118 N.C. App. 1, 9, 454 S.E.2d 278, 282 (1995). Thus, Hadley's claim for the bonuses accrued on January 31, 2009, and he had until January 31, 2011, to file suit. Hadley, however, did not file this action until April 17, 2014. See Compl. Accordingly, the two-year statute of limitations bars Hadley's Wage and Hour Act claim.

16

In opposition to this conclusion, Hadley cites Hamilton and argues that his Wage and Hour Act claim accrued on the date he was terminated. Hamilton, however, does not support this conclusion. Rather, Hamilton supports the general rule that the statute of limitations "begins to run on the date the promise [to pay wages] is broken." Hamilton, 118 N.C. App. at 9, 454 S.E.2d at 282 (quotation omitted). In Hamilton, an employer promised to pay for "any unused vacation days" upon termination of employment. Id., 454 S.E.2d at 282. Thus, the employer broke the promise in Hamilton on the date of termination, when the employer failed to pay for the unused vacation. See id., 454 S.E.2d at 282.

In contrast to Hamilton, defendants allegedly promised Hadley additional bonuses in January 2008, and they were due on or before January 31, 2009. By January 31, 2009, defendants had broken their promise, and the claim accrued. Accordingly, by January 31, 2011, Hadley's Wage and Hour Act claim had expired. Because Hadley's Wage and Hour Act claim is untimely, the court grants summary judgment to defendants on Hadley's Wage and Hour Act claim.

D.

Finally, Hadley alleges wrongful discharge in violation of North Carolina public policy. Consol. Compl. ¶¶ 124–33. According to Hadley, defendants wrongfully discharged him for complaining about unpaid wages and about defendants' alleged mismanagement of ARRA funds. See id.

A wrongful discharge claim is a narrow exception to North Carolina's general rule of employment at will. See, e.g., Whitt v. Harris Teeter, Inc., 359 N.C. 625, 625, 614 S.E.2d 531, 532 (2005) (per curiam) (adopting dissenting opinion below at 165 N.C. App. 32, 43–50, 598 S.E.2d 151, 159–63 (2004) (McCullough, J., dissenting)); Garner v. Rentenbach Constructors Inc., 350 N.C. 567, 568–72, 515 S.E.2d 438, 439–41 (1999); Amos v. Oakdale Knitting Co., 331 N.C. 348, 350–54, 416

17

S.E.2d 166, 167–70 (1992); Coman v. Thomas Mfg. Co., 325 N.C. 172, 176–78, 381 S.E.2d 445, 447–49 (1989). To prove a claim of wrongful discharge in violation of North Carolina public policy, a plaintiff must identify and rely upon a specific North Carolina statute or North Carolina constitutional provision as stating North Carolina public policy. Garner, 350 N.C. at 568–72, 515 S.E.2d at 439–41; Amos, 331 N.C. at 350–54, 416 S.E.2d at 167–70; Coman, 325 N.C. at 176, 381 S.E.2d at 447; Horne v. Cumberland Cty. Hosp. Sys., Inc., 228 N.C. App. 142, 146, 746 S.E.2d 13, 17–19 (2013); Gillis v. Montgomery Cty. Sheriff's Dep't, 191 N.C. App. 377, 379–81, 663 S.E.2d 447, 449–50 (2008); Whitings v. Wolfson Casing Corp., 173 N.C. App. 218, 222, 618 S.E.2d 750, 753 (2005); Considine v. Compass Grp. USA, Inc., 145 N.C. App. 314, 321, 551 S.E.2d 179, 184 (2001), aff'd, 354 N.C. 568, 557 S.E.2d 528 (2001) (per curiam). A plaintiff asserting wrongful discharge in violation of North Carolina public policy may not rely on federal law as stating North Carolina public policy. See, e.g., Coman, 325 N.C. at 176–78, 381 S.E.2d at 447–49; McDonnell v. Guilford Cty. Tradewind Airlines, Inc., 194 N.C. App. 674, 679–80, 670 S.E.2d 302, 306–07 (2009); Whitings, 173 N.C. App. at 222, 618 S.E.2d at 753; accord Warren v. Smithfield Packing Co., No. 5:14-CV-71-D, 2014 WL 1691513, at *1 (E.D.N.C. Apr. 29, 2014) (unpublished); Leach v. N. Telecom, Inc., 141 F.R.D. 420, 426 (E.D.N.C. 1991).

No rational jury could find that DEP's termination of Hadley's employment violated any North Carolina statute or constitutional provision. Thus, Hadley's wrongful discharge claim fails. See, e.g., Horne, 746 S.E.2d at 17–19; Gillis, 191 N.C. App. at 379–80, 663 S.E.2d at 449–50; Whitings, 173 N.C. App. at 222, 618 S.E.2d at 753; Considine, 145 N.C. App. at 321, 551 S.E.2d at 184.

In opposition to this conclusion, Hadley argues that he "engaged in protected activity by complaining that DEP was violating North Carolina's laws regarding payment of wages and North

18

Carolina and federal law [regarding mismanagement of ARRA funds]." [D.E. 65] 13; see Consol. Compl. ¶¶ 128–29. This court predicts that the Supreme Court of North Carolina would require Hadley to be more precise as to the "specific conduct by a defendant that violated a specific expression of North Carolina public policy" in a specific North Carolina statute or a specific provision of the North Carolina Constitution. Considine, 145 N.C. App. at 321–22, 551 S.E.2d at 184; see Garner, 350 N.C. at 568–72, 515 S.E.2d at 439–41; Amos, 331 N.C. at 350–54, 416 S.E.2d at 167–170; Coman, 325 N.C. at 176–78, 381 S.E.2d at 447–49; Horne, 228 N.C. App. At 146, 746 S.E.2d at 17–19; Gillis, 191 N.C. App. at 379–80, 663 S.E.2d at 449–50; Whitings, 173 N.C. App. at 222, 618 S.E.2d at 753. Moreover, and in any event, no rational jury could find that Hadley's termination violated North Carolina public policy. Thus, the court grants summary judgment to defendants on Hadley's wrongful discharge claim.

III.

In sum, the defendants' motion for summary judgment [D.E. 49] is GRANTED. Defendants may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 17 day of March 2016.

JAMES C. DEVER III
Chief United States District Judge